## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LINDA L. DICKENSON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00082 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Linda L. Dickenson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

Case 2:10-cv-00082-JPJ-PMS   Document 16   Filed 01/09/12   Page 1 of 34   Pageid#: 563

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Dickenson protectively filed her application for DIB on December 4, 2007, alleging disability as of November 14, 2007, due to depression, anxiety, fibromyalgia, arthritis in spine and post-traumatic stress disorder. (Record, ("R."), at 98-100, 115, 119.) The claim was denied initially and on reconsideration. (R. at 61-63, 66-67, 70-75.) Dickenson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 76-77.) The hearing was held on September 17, 2009, at which Dickenson was represented by counsel. (R. at 24-58.)

By decision dated October 16, 2009, the ALJ denied Dickenson's claim. (R. at 10-23.) The ALJ found that Dickenson met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 12.) The ALJ also found that Dickenson had not engaged in substantial gainful activity at any time since November 14, 2007. (R. at 12.) The ALJ found that the medical evidence established that Dickenson suffered from severe impairments, namely fibromyalgia, degenerative changes in the cervical and lumbar spine, hypertension, gastroesophageal reflux disease, sleep apnea, obesity and depression/anxiety, but she found that Dickenson did not have an impairment or combination of

impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-14.) The ALJ also found that Dickenson had the residual functional capacity to perform light work[1] that required no more than occasional crouching, crawling or stooping, no climbing, working at heights or operating dangerous equipment, in an indoor, temperature-controlled environment that allowed for a moderate reduction in concentration and required no more than simple, noncomplex tasks that did not require her to interact with the general public. (R. at 14-21.) Thus, the ALJ found that Dickenson was unable to perform any of her past relevant work. (R. at 21.) Based on Dickenson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including jobs as a babysitter/childcare worker, a companion sitter and a clerical helper. (R. at 22.) Thus, the ALJ found that Dickenson was not under a disability as defined under the Act and was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(g) (2011).

After the ALJ issued her decision, Dickenson pursued her administrative appeals, (R. at 6), but the Appeals Council denied her request for review. (R. at 1-5.) Dickenson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2011). The case is before this court on Dickenson's motion for summary judgment filed April 18, 2011, and the Commissioner's motion for summary

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2011).

-3-

judgment filed June 17, 2011.

## II. Facts

Dickenson was born in 1964, (R. at 98), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She obtained her general equivalency development diploma, ("GED"), and has past relevant work experience as a manager of a convenience store and a customer service representative with a catalog sales company. (R. at 30-32.) At the time of her hearing, Dickenson testified that she was 5 feet, 3 inches tall and weighed 318 pounds. (R. at 50.) She stated that she always had been a big woman. (R. at 50.)

In rendering her decision, the ALJ reviewed medical records from Dr. David Sheppard, D.O.; Johnston Memorial Hospital; Dr. Eric Parks, M.D.; Dr. Uzma Ehtesham, M.D.; Norton Community Hospital; Teresa A. Dunton, D.C., a chiropractor; Louis Perrott, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Donald Williams, M.D., a state agency physician; Solutions Counseling; Dr. Eric Moffet, M.D.; Dr. Michael Bible, M.D.; Pain Medicine Associates, P.C.; Dr. Gregory Corradino, M.D.; Dr. John Marshall, M.D.; and Wellmont Rehabilitation Services. Dickenson's counsel also submitted reports from B. Wayne Lanthorn, Ph.D., a licensed psychologist and chiropractor Dunton to the Appeals Council.[2]

---

[2] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether

-4-

The medical evidence shows that Dickenson sought treatment, including physical therapy, for problems with her neck, back and left shoulder as early as 2003. (R. at 186-88, 196.) On October 14, 2003, Dickenson told Dr. John Marshall, M.D., that she was injured at work when a 200-pound beer display case fell on top of her on October 3, 2003. (R. at 197.) Dr. Marshall noted that the diagnostic imaging showed degenerative disc changes in the thoracic and lumbar spine, but no fracture or disc herniation. (R. at 197.) On November 13, 2003, Dr. Marshall noted that an MRI of Dickenson's cervical spine showed a small right-sided disc protrusion with mild spurring at C6-7, but nothing on the symptomatic left side. (R. at 196.) On February 19, 2004, Dr. Marshall noted that Dickenson was off her work restrictions and was trying to get back to normal activity at work and home. (R. at 195.) Dickenson continued to treat with Dr. Marshall for complaints of back and left leg pain through July 2004. (R. at 189-94.)

On September 15, 2004, Dickenson saw Dr. Gregory Corradino, M.D., a neurosurgeon, for the results of a CT myelogram scan. (R. at 199.) Dr. Corradino stated that the CT scan showed a small disc protusion on the right side at the C6-7 level without nerve root compression or central stenosis. (R. at 199.) He stated that Dickenson's lumbar myelogram was within normal limits. (R. at 199.) Dr. Corradino told Dickenson that she did not have a problem that could be corrected by surgery. (R. at 199.) He told her he would be glad to see her in the future as needed. (R. at 199.)

---

substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

On January 13, 2005, Dickenson sought treatment from Theresa A. Dunton, D.C., of Cloverleaf Chiropractic. (R. at 423-26, 462-67.) Dickenson stated that she had suffered from low back pain since being injured at work when a beer display fell on her. (R. at 423.) Dickenson continued to treat with Dunton for low back pain through May 10, 2005. (R. at 426-43.)

On January 4, 2006, Dickenson was admitted to Norton Community Hospital complaining of chest pain. (R. at 200-207.) Further testing showed that Dickenson was anemic, but had not suffered a heart attack. (R. at 200-201.) She was discharged the next day to follow up outpatient with Dr. David Sheppard, D.O. (R. at 200-01.)

On March 24, 2006, Dickenson sought treatment from Pain Medicine Associates, P.C., on referral from Dr. Sheppard. (R. at 219-20.) Dickenson was seen by Holly Broadwater, F.N.P. (R. at 219-20.) Dickenson complained of pain in her neck, left shoulder, low back and left leg. (R. at 219.) Dickenson described her pain as throbbing, shooting, stabbing pain that was constant. (R. at 219.) Dickenson stated that the only thing that gave her any relief from the pain was lying down. (R. at 219.) Broadwater scheduled further radiographic images of Dickenson's neck, left shoulder and spine and prescribed Lortab. (R. at 220.)

Dickenson returned to see Broadwater on April 17, 2006. (R. at 218.) Broadwater noted that an MRI of Dickenson's cervical spine was within normal limits, an MRI of her lumbar spine showed some moderate facet arthropathy at the

-6-

L4-5 and L5-S1 levels, and an MRI of her left shoulder showed some mild degenerative changes. (R. at 218, 223-25.) Broadwater referred Dickenson to Dr. W. Turney Williams, M.D., of her practice, who performed lumbar facet blocks of her lower spine on May 18, 2006. (R. at 217.) On June 26, 2006, Dickenson told C. L. Conrad, F.N.P., that she got relief from this procedure for about one day and then the pain began to return. (R. at 217.) Conrad counseled Dickenson on the relationship between excessive weight and back pain and encouraged her to engage in nonweightbearing exercises in an effort to lose weight. (R. at 217.) Conrad referred Dickenson back to Dr. Williams for another lumbar facet block. (R. at 217.)

Dickenson saw Dr. Williams on July 13, 2006, complaining of low back pain, posterolateral thigh and posterolateral leg burning discomfort. (R. at 216.) Dickenson related constant discomfort, increased by any prolonged sitting or standing. (R. at 216.) Dr. Williams noted intact sensation and negative straight leg raises. (R. at 216.) Dr. Williams recommended that Dickenson try aquatic therapy to address her back pain, and, if that failed, he stated that he would perform a lumbar epidural injection. (R. at 216.) Dr. Williams also informed Dickenson of the need to reduce her weight to improve her back symptoms. (R. at 216.) Dr. Williams also gave Dickenson a prescription for Lyrica. (R. at 216.)

Dickenson returned to see Dr. Williams on August 31, 2006, complaining of bilateral low back pain with radiation into the left leg. (R. at 215.) Dickenson told Dr. Williams that she was recently treated at the local emergency department for

-7-

twisting her left ankle getting out of a car. (R. at 215.)  Dickenson stated that a brief trial of aquatic therapy was beneficial, but that she could not afford to continue. (R. at 215.) Dr. Williams noted that straight leg raises were negative and that sensory motor function was intact. (R. at 215.) Dr. Williams noted that there was diffuse tenderness to even light touch thoughout Dickenson's lumbar spine region. (R. at 215.)  Dr. Williams told Dickenson that her discomfort was likely facet-related and markedly exacerbated by her obesity and deconditioning. (R. at 215.)  Dr. Williams stated that Dickenson was unlikely to receive any lasting relief without significant weight loss. (R. at 215.)

Dickenson saw Dr. Sheppard for removal of a skin lesion on November 2, 2006, and asked for a different medication for her back pain. (R. at 259.) Dr. Sheppard prescribed Cataflam, Skelaxin and Lortab. (R. at 259.) On November 9, 2006, Dr. Sheppard noted that Dickenson had full range of motion in all extremities and that her mood and affect were normal. (R. at 257.) Dr. Sheppard also noted that she was scheduled to see a surgeon the next day to be evaluated for possible gastric bypass to treat her morbid obesity. (R. at 258.) There is no evidence contained in this record that Dickenson ever underwent such surgery.

On February 9, 2007, Dickenson returned to Dr. Sheppard complaining of increasing arthralgias. (R. at 254.) She complained of knots on her hands and pain in her hips. (R. at 254.) On this occasion, Dr. Sheppard noted that Dickenson weighed 323 pounds. (R. at 254.) Dr. Sheppard also noted tenderness to palpation over the costochondral junctions and chest wall and to the paraspinal muscles in

-8-

the lumbosacral region. (R. at 254.)

On April 13, 2007, Dickenson saw Dr. Michael W. Bible, M.D., a rheumatologist, on referral from Dr. Sheppard. (R. at 229-31.) Dickenson complained of pain in her low back and hips. (R. at 229.) Dr. Bible stated that Dickenson was healthy appearing, but overweight at 324 pounds. (R. at 230.) Dr. Bible noted good muscle strength in Dickenson's extremities. (R. at 230.) Dr. Bible found good range of motion in Dickenson's shoulders, wrists and knees with no joint swelling, tenderness or deformity. (R. at 230.) Dr. Bible diagnosed trochanteric bursitis bilaterally, chronic low back pain consistent with strain and erector spinae myofascitis bilaterally. (R. at 229.) He gave Dickenson injections in her hips and back and prescribed Soma. (R. at 229.)

On April 26, 2007, Dr. Sheppard noted that Dickenson was trying to observe a 1,500-calorie-a-day diet combined with exercise. (R. at 251.) He noted that Dickenson's weight was down by only three pounds. (R. at 251.) Dickenson told Dr. Sheppard that she had seen a rheumatologist, who had diagnosed her as suffering from bursitis and osteoarthritis. (R. at 251.) She also stated that she had undergone a psychiatric evaluation. (R. at 251.)

When Dickenson returned to see Dr. Bible on May 24, 2007, she stated that her hips were doing much better with no pain at all. (R. at 228.) Dickenson, however, said that her back had not improved. (R. at 228.) Dr. Bible stated that there was no evidence of radiculopathy. (R. at 228.) Dr. Bible gave Dickenson two

-9-

injections in her back area. (R. at 228.)

On May 25, 2007, Dickenson told Dr. Sheppard that she was under a lot of stress and had been tearful at times. (R. at 249.) Dr. Sheppard prescribed Cymbalta. (R. at 250.) On June 22, 2007, Dickenson told Dr. Sheppard that she never started taking the Cymbalta. (R. at 247.) Dr. Sheppard also noted arthritic changes in Dickenson's knees. (R. at 247.)

Dickenson was admitted to Norton Community Hospital again on August 11, 2007, complaining of chest pain. (R. at 232-38.) Dickenson stated that her chest pain started while in a confrontation with her boss at work. (R. at 234.) Dickenson said she felt short of breath and nauseated, and she broke out in a cold sweat. (R. at 234.) The physicians believed Dickenson's chest pain was anxiety-related, but admitted her to rule out that she had suffered a heart attack. (R. at 237-38.) Further testing ruled out a heart attack, and Dickenson was discharged on August 13, 2007. (R. at 232-33, 236.)

On August 16, 2007, Dr. Sheppard noted that Dickenson recently had been hospitalized to rule out a heart attack. (R. at 245.) Dickenson stated that she did not suffer a heart attack and that her physician thought the episode was stress-related. (R. at 245.) She stated that she felt overwhelmed at times. (R. at 245.) Dr. Sheppard noted that he was going to refer Dickenson for counseling and psychiatric evaluation. (R. at 246.)

Dickenson returned to see Dr. Sheppard on September 28, 2007. (R. at 243-44.) She told Dr. Sheppard that she had seen Dr. Moffett for anxiety,[3] but said the drive to Kingsport was too far, and she asked to be referred to Dr. Ehtesham. (R. at 243.) Dickenson's weight was down to 310 pounds. (R. at 243.) Dr. Sheppard noted that he would refer her to Dr. Ehtesham for her anxiety. (R. at 244.)

Solutions Counseling completed an Intake Assessment of Dickenson on October 11, 2007. (R. at 271-73.) Dickenson complained of increasing stressors since 1998. (R. at 271.) Dickenson stated that she had suffered a severe panic attack at work recently which left her hospitalized for four days. (R .at 271.) She also told the counselor that she was disabled from work. (R. at 271.) Dickenson denied any previous mental health treatment and said she felt "overwhelmed." (R. at 271.) Dickenson stated that while working at a convenience store, she was once robbed at gunpoint. (R. at 272.) Dickenson said she "[t]hought [she] was going to die." (R. at 272.)

Dickenson complained of severe depression, anxiety, crying spells and panic attacks. (R. at 273.) She stated that she suffered from decreased energy, attention/concentration and ability to sleep and increased appetite. (R. at 273.) The social worker noted that Dickenson appeared depressed and anxious. (R. at 273.) She diagnosed panic disorder without agoraphobia and major depression. (R. at 273.) She placed Dickenson's then-current Global Assessment of Functioning,

[3]The record reflects that Dickenson did see Dr. Eric D. Moffett, M.D, a psychiatrist, on September 20, 2007, but Dr. Moffett's notes are not legible. (R. at 240-42.)

("GAF"),[4] score at 62.[5] (R. at 273.)

On October 26, 2007, Dickenson reported experiencing increased stressors. (R. at 277.) She complained of moderate depression, severe anxiety, moderate crying spells and moderate panic attacks. (R. at 277.) Dickenson stated that her energy level had moderately decreased, but that her attention/concentration was "OK." (R. at 277.) The counselor noted that Dickenson was depressed and anxious with racing thoughts, but no paranoia or delusions. (R. at 277.)

Dickenson started treatment with Dr. Uzma Ehtesham, M.D., a psychiatrist, on November 5, 2007. (R. at 296-97.) Dr. Ehtesham noted that Dickenson was referred by Dr. Sheppard. (R. at 296.) Dickenson said that she felt frustrated, overwhelmed and more angry than sad. (R. at 296.) Dr. Ehtesham noted that Dickenson's mood was sad, and her affect was restricted. (R. at 297.) Dr. Ehtesham also noted some paranoid ideation. (R. at 297.) Dr. Ehtesham prescribed Klonopin and increased her dosage of Cymbalta. (R. at 297.)

Dickenson returned to Solutions Counseling on November 8, 2007, stating that she "felt better." (R. at 276.) The counselor noted that Dr. Ehtesham had increased Dickenson's prescription for Cymbalta and added Klonopin. (R. at 276.)

---

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[5] A GAF of 61-70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

-12-

Dickenson complained of moderate depression, severe anxiety and panic attacks. (R. at 276.)  She stated that her energy level and attention/concentration had increased. (R. at 276.)  She stated that her appetite and sleep were "OK." (R. at 276.) The counselor noted that Dickenson was depressed and anxious with racing thoughts, but no paranoia or delusions. (R. at 276.)

On November 15, 2007, Dr. Ehtesham stated that Dickenson's depression, anxiety and mood swings were worse. (R. at 295.) Dickenson told Dr. Ehtesham that she was more sad than angry. (R. at 295.)  Dr. Ehtesham decreased Dickenson's dosage of Cymbalta and started her on Wellbutrin, Xanax and Abilify. (R. at 295.) Dr. Ehtesham also wrote a prescription note which stated that Dickenson needed to be off work until further notice. (R. at 294.)  On November 26, 2007, Dr. Ehtesham noted that Dickenson's panic attacks were worse recently. (R. at 293.) Dickenson did not appear for her November 29, 2007, appointment. (R. at 276.)

Dr. Ehtesham completed an Assessment Of Ability To Do Work-Related Activities (Mental) on December 7, 2007. (R. at 278-80.) Dr. Ehtesham stated that Dickenson had a seriously limited ability or no useful ability to function in all work-related adjustment areas due to severe depression and mood swings. (R. at 278-79.) Dr. Ehtesham also stated that Dickenson had anger problems. (R. at 278.) Dr. Ehtesham said that Dickenson's concentration and memory was decreased and that her mind raced at times. (R. at 279.) Dr. Ehtesham also noted that Dickenson suffered from panic attacks. (R. at 279.)

On December 10, 2007, Dr. Ehtesham noted that Dickenson's anxiety was

-13-

worse and that she was paranoid off and on. (R. at 292.) Dickenson said that she was under less stress and that her depression had decreased. (R. at 292.) Dr. Ehtesham started Dickenson on Geodon, a medication used to treat schizophrenia. (R. at 292.)

Dr. Sheppard completed an Assessment Of Ability To Do Work-Related Activities (Physical) on December 12, 2007. (R. at 281-83.) Dr. Sheppard stated that Dickenson could occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds. (R. at 281.) He stated that her ability to stand and walk was not affected, but he said that she could sit for up to four hours in an eight-hour workday if she was able to change positions. (R. at 282.) Dr. Sheppard stated that Dickenson should never climb, stoop, crouch or crawl, but could occasionally kneel and balance. (R. at 282.) He also stated that she should not work around moving machinery. (R. at 283.) Dr. Sheppard stated that his assessment was supported by Dickenson's degenerative disc disease. (R. at 281-83.)

On December 13, 2007, Dickenson told the counselor that Dr. Ehtesham had taken her off work until the end of January. (R. at 275.) On this occasion, Dickenson complained of severe depression and severe anxiety with moderate crying spells and moderate panic attacks. (R. at 275.) She stated that her energy and her attention/concentration had moderately decreased. (R. at 275.) The counselor noted that Dickenson was depressed and anxious with racing thoughts, but no paranoia or delusions. (R. at 275.)

Dickenson returned to see Dr. Sheppard on December 28, 2007, concerned

-14-

that she might have fibromyalgia. (R. at 329-30.) Dickenson stated that she did not sleep well at night, hurt all over, and her skin would sting. (R. at 329.) Dickenson told Dr. Sheppard that Dr. Ehtesham had taken her off of work due to post-traumatic stress disorder. (R. at 329.) Dickenson also complained of pain with palpation over the cervical spine, trapezius, lateral arms and lateral thighs. (R. at 329.) Dr. Sheppard gave Dickenson a prescription for Lyrica, and he recommended regular exercise. (R. at 329-30.)

On January 8, 2008, the counselor's note stated that Dickenson continued off work. (R. at 274.) Dickenson complained that stress in the workplace caused her increased anxiety and that she became increasingly paranoid when she thought about returning to work. (R. at 274.) Dickenson complained of moderate depression, severe anxiety, mild crying spells and severe panic attacks. (R. at 274.) Dickenson stated that her appetite and her energy level had moderately increased. (R. at 274.)

On January 8, 2008, Dr. Ehtesham noted that Dickenson was doing better. (R. at 291.) Dickenson said that her panic attacks were occurring less frequently and were less severe. (R. at 291.) Dickenson said that her depression was improving off and on. (R. at 291.) She also complained of not being able to show emotions. (R. at 291.)

Dickenson returned to see Dr. Ehtesham on January 16, 2008, complaining of being under severe stress. (R. at 290.) She stated that she had returned to work on January 12 and experienced a panic attack. (R. at 290.) Dickenson said that she was feeling less angry, but more sad. (R. at 290.) She stated that she had been

-15-

diagnosed with fibromyalgia recently. (R. at 290.) Dr. Ehtesham stated that Dickenson's affect was depressed, and her mood was anxious. (R. at 290.)

On January 24, 2008, Dr. Ehtesham completed a Mental Status Evaluation Form which stated that Dickenson suffered from major depressive disorder without psychosis. (R. at 285-89.) While some of Dr. Ehtesham's writing on this form is illegible, it does state that Dickenson's relationships with family, friends and co-workers were impaired, she was violent at times, and her sleep was decreased. (R. at 285-86.) Dr. Ehtesham stated that Dickenson was very depressed with major mood swings. (R. at 287.) Dr. Ehtesham stated that Dickenson's memory was impaired, and her thought content was illogical with a history of hallucinations. (R. at 287.) Dr. Ehtesham also stated that Dickenson was confused at times, her thinking was concrete, with poor judgment, poor fund of information and decreased concentration and attention. (R. at 288.)

On February 5, 2008, Dr. Ehtesham stated that Dickenson was less anxious, felt less like a failure and was having fewer mood swings and crying spells. (R. at 353.) Dickenson also complained of insomnia, and Dr. Ehtesham prescribed Rozerem, a sleep aid. (R. at 353.) Dr. Ehtesham noted that Dickenson's appearance was labile, her affect was depressed, and her mood was anxious and irritable. (R. at 353.) She noted that Dickenson's sensorium and memory were intact, her thought content was unremarkable, her thought processes linear, and her judgment was normal. (R. at 353.)

Dickenson returned to Dr. Sheppard on February 8, 2008, requesting that he complete a disability form. (R. at 327-28.) Dr. Sheppard noted that he told

-16-

Dickenson that since Dr. Ehtesham removed her from work, that he would prefer Dr. Ehtesham to complete the form. (R. at 327.) Dickenson said that she could not tolerate taking Lyrica and had discontinued its use. (R. at 327.) Dr. Sheppard noted that Dickenson's weight was down to 308 pounds. (R. at 327.) Dr. Sheppard stated that Dickenson complained of pain with palpation of the paraspinal muscles in the lumbosacral region, trapezium, anterior chest wall and lateral thighs consistent with fibromyalgia. (R. at 327.) Dr. Sheppard recommended Dickenson obtain a sleep study to determine if she suffered from sleep apnea. (R. at 328.)

Dr. Donald Williams, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment for Dickenson on February 12, 2008. (R. at 298-304.) Dr. Williams stated that Dickenson could occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds. (R. at 299.) He stated that Dickenson could stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. (R. at 299.) Dr. Williams stated that she could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 300.) Dr. Williams also stated that Dickenson suffered from no manipulative, visual, communicative or environmental limitations. (R. at 300-301.)

Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment on Dickenson on February 13, 2008. (R. at 305-307.) Hamilton stated that Dickenson was moderately limited in her ability to understand, remember and carry out detailed job instructions, to maintain attention and concentration for extended periods, to work in coordination with or

-17-

proximity to others without being distracted by them, to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in work settings and to set realistic goals or make plans independently of others. (R. at 305-06.) Hamilton stated that Dickenson was markedly limited in her ability to interact appropriately with the general public. (R. at 306.) In all other areas, Hamilton stated that Dickenson was not significantly limited. (R. at 305-06.) Hamilton did state that Dickenson was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (R. at 307.) Hamilton also completed a Psychiatric Review Technique form, ("PRTF"), on which she stated that Dickenson had moderate difficulties in maintaining concentration, persistence or pace. (R. at 318.)

On February 28, 2008, Dickenson returned to Dr. Sheppard complaining of neck and left shoulder pain. (R. at 325-26.) Dr. Sheppard ordered x-rays of her cervical spine and left shoulder and prescribed ibuprofen. (R. at 325.)

On March 13, 2008, Dickenson told Dr. Ehtesham that her sleep was increased on Rozerem. (R. at 352.) Dickenson said that she hurt a lot and would wake up several times a night. (R. at 352.) Dickenson said that she was less uptight and suffering from fewer anxiety attacks. (R. at 352.) Dr. Ehtesham started Dickenson on trazadone in addition to her other medications. (R. at 352.) On April 8, 2008, Dickenson told Dr. Ehtesham that her panic attacks and crying spells had

-18-

decreased. (R. at 351.)  She stated that she was still irritable. (R. at 351.)

In May 2008, Dickenson's chief complaint to Dr. Ehtesham was that she was having dreams about suicide. (R. at 350.) She complained of excessive worry, fatigue, irritability, sleep disturbances, sweating, shortness of breath, chest pain and sadness. (R. at 350.) Dickenson denied experiencing any mania, delusion, hallucinations, post-traumatic stress disorder or problems with her attention. (R. at 350.) Dr. Ehtesham listed her affect as anxious with a congruent mood and congruent thoughts. (R. at 350.)  Dr. Ehtesham stated that Dickenson's insight was improved, her judgment was intact, and her thought processes were goal oriented. (R. at 350.) Dr. Ehtesham noted that Dickenson presented no imminent threat of suicide or homicide at that time. (R. at 350.) Dr. Ehtesham discontinued Dickenson's Rozerem and trazodone and started her on Seroquel. (R. at 350.)

Dickenson returned to see Dr. Sheppard on June 10, 2008, complaining of fatigue. (R. at 323-24.) Dickenson complained of pain with palpation in the paraspinal muscles in the lumbosacral region. (R. at 323-24.) Dr. Sheppard stated that x-rays of Dickenson's neck and shoulder were unremarkable. (R. at 323.)

Louis Perrott, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment on Dickenson on June 20, 2008. (R. at 331-33.)  Perrott stated that Dickenson was moderately limited in her ability to understand, remember and carry out detailed job instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruption from psychologically based symptoms and to

-19-

perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to respond appropriately to changes in work settings and to set realistic goals or make plans independently of others. (R. at 331-32.) Perrott stated that Dickenson was markedly limited in her ability to interact appropriately with the general public. (R. at 332.) In all other areas, Perrott stated that Dickenson was not significantly limited. (R. at 331-32.) Perrott did state that Dickenson was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (R. at 333.) He also stated that Dickenson was capable of performing simple, unskilled work. (R. at 333.) Perrott also completed a PRTF, on which he stated that Dickenson had moderate difficulties in maintaining concentration, persistence or pace. (R. at 344.)

On June 30, 2008, Dickenson returned to Dr. Ehtesham complaining of increased depression and isolating herself by wanting to stay in a dark room. (R. at 349.) On July 15, 2008, Dr. Ehtesham noted that Dickenson's depression was still severe and exacerbated her pain. (R. at 348.) Dickenson also complained of a lot of fear with panic attacks once or twice a month. (R. at 348.)

Dickenson returned to see Dr. Bible on July 18, 2008. (R. at 354.) On that occasion, Dr. Bible noted that Dickenson had no upper extremity complaints, no pain in her hips and no suggestion of radiculopathy. (R. 354.) Dr. Bible told Dickenson to return only as needed. (R. at 354.)

On August 14, 2008, Dr. Ehtesham noted that Dickenson was scared at work and suffered some panic attacks since her last visit. (R. at 368.) Dickenson again

-20-

stated that her depression was less severe, but she was more withdrawn than before. (R. at 368.)

On September 10, 2008, Dickenson saw Dr. Sheppard with a myriad of complaints, including fatigue and difficulty sleeping. (R. at 356.)

On September 30, 2008, Dickenson complained of a traumatic incident in which her grandchild quit breathing on her. (R. at 366.) On October 29, 2008, Dickenson told Dr. Ehtesham she was "still surviving." (R. at 364.) She stated that she was dreading a lot and grieving the death of her father. (R. at 364.)

On November 15, 2008, Dr. Ehtesham completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental). (R. at 359-61.) Dr. Ehtesham stated that Dickenson had no useful ability in all areas except for a seriously limited ability to understand, remember and carry out simple job instructions and to interact with the public. (R. at 359-60.) Dr. Ehtesham noted that Dickenson had severe anger, mood swings and panic attacks. (R. at 359-60.) She also stated that Dickenson would get paranoid ideations. (R. at 359.) Dr. Ehtesham stated that Dickenson was permanently disabled. (R. at 361.) On November 18, 2008, Dr. Ehtesham noted that Dickenson was in the numb phase of grieving. (R. at 362.) She stated that Dickenson's anger was stable, but that her mind would race when she was alone. (R. at 362.)

Dickenson returned to see Dr. Sheppard on December 10, 2008. (R. at 373-74.) She complained of pain in the lateral aspect of her right heel, jerking legs at night and a racing heart. (R. at 373.) Dr. Sheppard noted Dickenson's weight at

316 pounds. (R. at 373.)

On January 13, 2009, Dickenson told Dr. Ehtesham that she was "stressed out." (R. at 371.) She complained of increased anxiety and less motivation. (R. at 371.) Dickenson complained of worsening depression and crying spells with decreased sleep on February 25, 2009. (R. at 383.) Dr. Ehtesham increased her dosage of Cymbalta and Seroquel. (R. at 383-84.)

On March 24, 2009, Dickenson complained of having a rough time due to worsening depression. (R. at 381.) She stated that she felt hopeless and did not care. (R. at 381.) She complained of breaking out in hives and feeling like her skin was peeling off. (R. at 381.) Dr. Ehtesham noted that Dickenson was experiencing passive suicidal ideations requiring hospitalization, although the record contains no evidence that she was hospitalized. (R. at 381.)

On April 29, 2009, Dickenson told Dr. Ehtesham that her depression and anger had improved. (R. at 379.) On May 27, 2009, Dickenson complained of being more nervous with less depression. (R. at 401.) She also complained of feeling groggy, and Dr. Ehtesham instructed her not to drive. (R. at 401-02.)

Dickenson was admitted to Norton Community Hospital complaining of chest pain on July 18, 2009. (R. at 408-16.) Dickenson was discharged later the same day with no indication she had suffered a heart attack. (R. at 408-09.) She was scheduled for an outpatient stress test. (R. at 409.)

On July 21, 2009, Dickenson stated that her chest pain was worse, and she had been hospitalized. (R. at 399.) Dr. Ehtesham completed another Medical

-22-

Source  Statement Of Ability To Do Work-Related Activities (Mental) on this date. (R. at 403-05.)  Dr. Ehtesham stated that Dickenson had no useful ability in all areas except for a seriously limited ability to understand and remember complex job instructions and to interact with the public. (R. at 403-04.) Dr. Ehtesham noted that Dickenson had anger, mood swings, severe depression and worsening panic attacks. (R. at 403-04.) She again stated that Dickenson was permanently disabled. (R. at 405.)

On August 3, 2009, Dickenson returned to see Dr. Sheppard complaining of worsening pain in her neck and shoulder which was affecting her nerves. (R. at 417.) On this date, Dr. Sheppard also completed an application for Dickenson to receive a Virginia disabled parking license plate on which he stated that Dickenson could not walk more than 200 feet without stopping to rest. (R. at 406-07.)

On August 18, 2009, Dickenson told Dr. Ehtesham that she was having problems with her family. (R. at 421.) She also said her depression was worse. (R. at 421.)

Dickenson had a sleep study performed on September 9, 2009, which showed that she suffered from severe obstructive apnea/hypopnea syndrome. (R. at 460-61.) Dr. Charlie P. Cole, M.D., recommended aggressive weight loss with diet and exercise. (R. at 461.) He also told her to avoid taking sedatives. (R. at 461.)

On September 15, 2009, Dickenson told Dr. Ehtesham that she had sleep apnea. (R. at 419.) She also said that she felt numb a lot, and her depression and anger was worse. (R. at 419.) Dr. Ehtesham noted a history of hallucinations and

Case 2:10-cv-00082-JPJ-PMS   Document 16   Filed 01/09/12   Page 23 of 34   Pageid#: 585

paranoia. (R. at 419.) Dickenson continued to treat with Dr. Ehtesham through June 15, 2010. (R. at 469-82.) On November 18, 2009, Dr. Ehtesham noted that Dickenson had been admitted to the hospital recently because of panic attacks. (R. at 479.)

Dickenson saw Dr. Sheppard on November 2, 2009, complaining of back pain for the past six weeks with radiculopathy down both legs into her feet. (R. at 504.) Dr. Sheppard's December 8, 2009, report reflects that Dickenson had been hospitalized recently for chest pain. (R. at 502.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, performed a psychological consultative evaluation of Dickenson on December 29, 2009, at the request of her attorney. (R. at 447-57.) Lanthorn administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Dickenson achieved a verbal comprehension index score of 76, a perceptual organization index score of 77, a working memory index score of 74, a processing speed index score of 79 and a full-scale IQ score of 72. (R. at 448.) Lanthorn stated that Dickenson was oriented in all spheres. (R. at 449.) Lanthorn said that Dickenson gave a good effort on the WAIS-IV and that he considered the results valid. (R. at 453.) Lanthorn stated that Dickenson's scores placed her in the borderline range of intellectual functioning. (R. at 453.)

Lanthorn questioned the validity of Dickenson's results on the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), but said that the inconsistencies could have been caused by marked psychiatric distress. (R. at 454.) Lanthorn stated that the test results showed that Dickenson was experiencing

-24-

moderate to severe emotional distress characterized by depression, dysphoria, anhedonia, agitation, anxiety and guilt. (R. at 455.) Lanthorn stated that the results showed that Dickenson was likely to be impatient, irritable and often angry, have difficulty initiating tasks and not care what happened to her. (R. at 455.)

Lanthorn stated that the test results indicated that Dickenson had problems with concentration, forgetfulness and memory. (R. at 455.) Lanthorn also stated that Dickenson tended to be somewhat suspicious and hostile and often felt mistreated. (R. at 455.) He stated that Dickenson was quite withdrawn and tended to keep others at a distance. (R. at 455.) He also stated that her behavior was likely to be somewhat unpredictable and inappropriate at times. (R. at 455.)

Dickenson told Lanthorn that she had suffered from chronic low back pain since injuring her back on the job in 2003. (R. at 450.) Dickenson stated that she had the most pain in her lower back, hips, neck and shoulders, and she placed her pain at a level of 9 on an 10-point scale even with her current medications. (R. at 450.) Dickenson stated that, because of the pain, she could no longer do what she used to and could work in only short spurts doing light housework. (R. at 451.)

Dickenson said that she first began developing psychiatric problems at the age of 14 following the death of her brother in a car accident. (R. at 452.) Lanthorn noted that Dickenson's affect was quite flat and blunt and that she also was tense and on-edge. (R. at 452.) Lanthorn described her mood as agitated depression. (R. at 452.) Dickenson stated that she had struggled with depression most of her life and that, even on medication, she continued to be quite depressed most of the time. (R. at 452.) She stated that she was very irritable, often angry,

-25-

very moody and cried occasionally. (R. at 452.) Dickenson said she had very low energy levels and no sex drive. (R. at 452.) She said she took little pleasure in anything. (R. at 452.)

Dickenson reported seeing "shadows" out of the corner of her eyes and hearing people call her name.  (R. at 452.) Lanthorn stated that these did not appear to be full-fledged visual hallucinations. (R. at 452.) She stated she was often anxious, on-edge, fidgety, restless, tense and easily overwhelmed by stressors. (R. at 453.) She reported frequent panic attacks lasting 30 minutes or longer. (R. at 453.) During these attacks, she stated that she found it difficult to breathe, her heart raced, and she trembled. (R. at 453.)

Lanthorn diagnosed Dickenson as suffering from bipolar II disorder (recurrent major depressive episodes with hypomanic episodes); panic disorder without agoraphobia, pain disorder with psychological factors, and borderline intellectual functioning. (R. at 455-56.)  He placed Dickenson's then-current GAF score at 50.[6] (R. at 456.) Lanthorn stated that Dickenson's prognosis was guarded, and he recommended ongoing psychiatric treatment with psychotherapeutic assistance. (R. at 456.) Lanthorn stated that Dickenson would have no limitation in learning simple job tasks, but would have moderate limitations in trying to learn and regularly perform complicated and abstract tasks. (R. at 456.) He also stated that she would have moderate or greater limitations interacting with supervisors, co-workers and the public, mild to moderate limitations on sustaining

---

[6] A GAF of 41-50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

-26-

concentration and persisting at task and moderate limitations in dealing with changes in and the requirements of the workplace. (R. at 456-57.)

Lanthorn also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental). (R. at 444-46.) Lanthorn stated that Dickenson had a seriously limited, but not precluded, ability to perform in all area except for no useful ability in the areas of dealing with work stress, understanding, remembering and carrying out complex job instructions and behaving in an emotionally stable manner. (R. at 444-45.) Lanthorn also stated that Dickenson would, on average, be absent from work more than two days a month due to her mental impairments or mental health treatment. (R. at 446.)

On March 8, 2010, Dickenson saw Dr. Eric D. Parks, M.D., of Watauga Orthopaedics, for complaints of right shoulder pain. (R. at 485-88.) Dr. Parks noted no swelling, erythema or warmth on palpation of the right shoulder. (R. at 486.) He did note some tenderness over the subacromial bursa. (R. at 486.) Dr. Parks stated that he thought her problems were due to some tendinopathy rather than a tear of the rotator cuff. (R. at 486.)

On April 7, 2010, Dickenson saw Whitney Brooke Mays, a NP-C with Dr. Sheppard's office. (R. at 495-96.) Dickenson said that she was unable to fully extend or flex the left knee. (R. at 495.) Mays noted mild crepitus with passive range of motion of the left knee with restricted extension and flexion. (R. at 495.) On May 7, 2010, Dickenson returned to see Dr. Sheppard complaining of pain in her left ankle. (R. at 493.)

-27-

On June 23, 2010, Dr. Sheppard completed an Assessment Of Ability To Do Work-Related Activities (Physical). (R. at 507-08.) Dr. Sheppard stated that Dickenson could occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds. (R. at 507.) He stated that Dickenson could stand and walk less than two hours in an eight-hour workday and that she could sit for two hours in an eight-hour workday. (R. at 507-508.) Dr. Sheppard said that Dickenson could occasionally stoop, kneel and balance, but never climb, crouch or crawl. (R. at 508.) Dr. Sheppard also stated that Dickenson should not work around heights or moving machinery. (R. at 509.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1250(a) (2011).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

By decision dated October 16, 2009, the ALJ denied Dickenson's claim. (R. at 10-23.) The ALJ found that Dickenson met the nondisability insured status requirements of the Act for DIB purposes through December 31, 20011. (R. at 12.) The ALJ also found that Dickenson had not engaged in substantial gainful activity at any time since November 14, 2007. (R. at 12.) The ALJ found that the medical evidence established that Dickenson suffered from severe impairments, namely fibromyalgia, degenerative changes in the cervical and lumbar spine, hypertension, gastroesophageal reflux disease, sleep apnea, obesity and depression/anxiety, but she found that Dickenson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-14.) The ALJ also found that Dickenson had the residual functional capacity to perform light work that required no more than occasional crouching, crawling or stooping, no climbing, working at heights or operating dangerous equipment, in an indoor, temperature-controlled environment that allowed for a moderate reduction in concentration and required no more than simple, noncomplex tasks that did not require her to interact with the general public. (R. at 14-21.) Thus, the ALJ found that Dickenson was unable to perform any of her past relevant work. (R. at 21.) Based on Dickenson's age, education, work history and residual functional capacity and the testimony of a vocational

expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including jobs as a babysitter/childcare worker, a companion sitter and a clerical helper. (R. at 22.) Thus, the ALJ found that Dickenson was not under a disability as defined under the Act and was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(g) (2011).

Dickenson argues that the ALJ erred by failing to give controlling weight to the opinions of her treating physicians, Dr. Sheppard and Dr. Ehtesham. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Dickenson also argues that the ALJ erred by failing to give appropriate consideration to Dickenson's obesity and its effect on her ability to perform work-related activities. (Plaintiff's Brief at 7-8.)

Based on my review of the ALJ's decision, I find that she gave appropriate consideration to Dickenson's obesity. In particular, the ALJ listed Dickenson's obesity as a separate severe impairment. (R. at 12.) The ALJ also considered the effect of Dickenson's obesity in relation to her other physical impairments. (R. at 17-18.) Furthermore, as the ALJ noted, Dickenson testified that she had been overweight most of her adult life, and it had never prevented her from work. (R. at 18.)

I also find that there is substantial evidence in the record to support the ALJ's finding as to Dickenson's physical residual functional capacity. The ALJ found that, physically, Dickenson could perform light work that required no more than occasional crouching, crawling or stooping, no climbing, working at heights

-30-

or operating dangerous equipment, in an indoor, temperature-controlled environment. Despite Dickenson's argument, the ALJ's finding is largely consistent with Dr. Sheppard's assessment of Dickenson's work-related abilities. In December 2007, Dr. Sheppard stated that Dickenson could occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds. (R. at 281.) He stated that her ability to stand and walk was not affected, but he said that she could sit for up to four hours in an eight-hour workday if she was able to change positions. (R. at 281-82.) Dr. Sheppard stated that Dickenson should never climb, stoop, crouch or crawl, but could occasionally kneel and balance. (R. at 282.) He also stated that she should not work around moving machinery. (R. at 283.) Thus, the ALJ's finding varies from Dr. Sheppard's only in that the ALJ found that Dickenson could occasionally crouch, crawl and stoop.

Dr. Sheppard is the only physician who treated Dickenson who placed any limitations on her physical abilities. Dr. Williams, the pain specialist, Dr. Corradino, the neurosurgeon, Dr. Bible, the rheumatologist, and Dr. Marshall, the rehabilitation specialist, did not place any restrictions on Dickenson's physical, work-related abilities. Furthermore, it is apparent that Dr. Sheppard did not believe that Dickenson was completely disabled from work, in that, in February 2008, Dr. Sheppard deferred completion of a disability form to Dr. Ehtesham, who had removed Dickenson from work. (R. at 327.) The ALJ's residual functional capacity finding also is supported by the findings of the state agency physicians, Dr. McGuffin and Dr. Donald Williams.

I do not, however, find that substantial evidence supports the ALJ's finding as to Dickenson's mental residual functional capacity. The only restrictions the

-31-

ALJ placed on Dickenson's mental work-related abilities was that she had a moderate reduction in concentration and required no more than simple, noncomplex tasks that did not require her to interact with the general public. In reaching this finding, the ALJ stated that she was rejecting Dr. Ehtesham's assessments of Dickenson's work-related abilities in their entirety due to the "paucity of medical signs and findings contained in the objective medical record." (R. at 19.) Unfortunately, in reaching this conclusion, the ALJ did not have the benefit of Lanthorn's consultative psychological evaluation, which, in part, supports Dr. Ehtesham's findings. Since Lanthorn's report was before the Appeals Council, this court must consider it in determining whether substantial evidence supports the ALJ's findings. *See Wilkins,* 953 F.2d at 96. That being the case, I find that substantial evidence does not support the ALJ's finding with regard to Dickenson's mental residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The Commissioner adequately considered Dickenson's obesity and its effect on her ability to work;

2. Substantial evidence exists to support the Commissioner's finding as to Dickenson's physical residual functional capacity;

3. Substantial evidence does not exist to support the Commissioner's finding as to Dickenson's mental residual functional capacity; and

-32-

4. Substantial evidence does not exist in the record to support the Commissioner's finding that Dickenson was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Dickenson's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand Dickenson's claim to the Commissioner for further consideration.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to

the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: January 9, 2012.

*s/ Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE